NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0815n.06

Case No. 08-4389

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

**Dec 21, 2009**

LEONARD GREEN, Clerk

EDWARD PATRICK,                                )
                                               )
    Plaintiff-Appellant,               )
                                               )
                                               )   ON APPEAL FROM THE
    v.                                 )   UNITED STATES DISTRICT
                                               )   COURT FOR THE NORTHERN
CLEVELAND SCENE PUBLISHING, LLC;               )   DISTRICT OF OHIO
THOMAS FRANCIS,                                )
                                               )
    Defendants-Appellees.              )
                                               )
_____        )

BEFORE:  BATCHELDER, Chief Judge; DAUGHTREY, Circuit Judge; and VAN TATENHOVE[*], District Judge.

    **ALICE M. BATCHELDER, Circuit Judge.**  Edward Patrick, M.D., Ph.D., appeals the order of the district court granting summary judgment to defendants Cleveland Scene and Thomas Francis, and denying summary judgment to Patrick, in Patrick's action brought under the court's diversity jurisdiction claiming that Cleveland Scene's publication of Francis's article Playing Doctor on October 27, 2004, was defamatory.  Because we find that Dr. Patrick failed to demonstrate the threshold requirement of falsity regarding the main imputation or gist of Playing Doctor for his defamation claim, we affirm the judgment of the district court.[1]

---

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

[1]Dr. Patrick's complaint also raised claims of false-light invasion of privacy and invasion of privacy by publication of private facts, on both of which the district court granted summary judgment to the defendants.  Dr. Patrick's briefs on appeal neither mention nor argue the judgment as to those claims and any appeal as to those

**I.**

Dr. Patrick is an emergency medicine doctor who has taken a somewhat peripatetic path throughout his training. He began his non-medical graduate education by earning a Ph.D. in electrical engineering from Purdue University in 1966, and a medical degree from Indiana University in 1974. The next part of Dr. Patrick's medical training, which involves his time spent in Cincinnati, Ohio, training at Jewish Hospital under the tutelage of Dr. Henry Heimlich, its director of surgery,[2] is the subject of some dispute. To begin with, Dr. Patrick's position and medical field during this period are unclear. They are listed variously on his curricula vitae and job applications as: "Rotating Internship"; "Resident I"; "Residency Surgery and Medicine"; "Medical Residency/Medicine & Surgery (Rotating)"; "Resident I (designed for Emergency Medicine)"; "Internship/Rotating Emergency Med, Surgery"; "PGI Surgery"; "Internship"; and "Residencies, Fellowships, Preceptorships, Teaching Appointments/Emergency Medicine."[3] Dr. Patrick's designations of the location of the claimed positions are also inconsistent; the location is listed sometimes solely as Jewish Hospital or University of Cincinnati, and sometimes as Jewish Hospital, University of Cincinnati. Similarly, Dr. Patrick's documents are not consistent in stating the years during which he held the position. For example, his Lima Hospital application claims that it ran

---

claims is therefore waived.

[2]Dr. Heimlich is the inventor of the famous "Heimlich Maneuver" for treatment of choking. The maneuver's genesis has been in some dispute, with Dr. Patrick publicly claiming partial credit for its invention. That issue, however, is not germane to our disposition of Dr. Patrick's claims.

[3]Michael Bowen said in his deposition that he, Bowen, was also inconsistent in his use of titles (i.e., resident or intern) to describe this position, but this merely explains the possible genesis of some of Dr. Patrick's inconsistency regarding them. It does not affect the veracity of Playing Doctor's gist, which is a holistic concept not defined by the truth or falsity of its individual components. *See Orr v. The Argus-Press Co*., 586 F.2d 1108, 1112 (6th Cir. 1978). It also does not explain Dr. Patrick's inconsistencies regarding the duration, location, or field of medicine of his residency.

from 1974-1976; his Dearborn Hospital application shows it as a one-year position in 1975; and his Scott Memorial hospital application expands it to a five-year position from 1975-1979.

Dr. Patrick also claims that he was engaged in other training activities during this same time period, including — according to his American Medical Association profile — a post-graduate medical training program in emergency medicine at "Deaconess Hsp/Cleveland" from "9/1976 - 8/1978," and a residency at the Heimlich Institute, "Specialty: EM" from 1976 to 1979 as represented on a professional liability insurance application. Further, on several curricula vitae and job applications, Dr. Patrick has variously characterized the 1976 to 1979 period as a "special residency" or "specially arranged residency" "under directorship of Henry J. Heimlich" or "supervised by Henry J. Heimlich" at various hospitals. Dr. Patrick's training-related inconsistencies on these documents are exacerbated by his also listing multiple birth dates for himself, ranging from his actual birth date, October 7, 1937, to dates in 1942 and 1947. This carelessness — or worse — regarding his birth date led to confusion in 2005 within NES Healthcare Group, for whom Dr. Patrick was working at the time, as to "whether this was the same physician" — i.e., whether the Edward Patrick whose Ohio medical license listed a birth date of 1937 was the same Edward Patrick whose North Carolina medical license listed a birth date of 1947.

Not surprisingly, Dr. Patrick's claimed stint at Jewish Hospital in Cincinnati has generated a flurry of requests to that hospital, asking for verification of his position there. The record contains eleven requests to the hospital, and one to Dr. Heimlich, asking for verification of the range of titles, specialties, and durations of Dr. Patrick's time and training there. Francis's notes from his interview of Michael Bowen, the Administrative Director of the Department of Surgery at Jewish Hospital, reflect this:

3

Francis: You complained to the medical board about getting tons of verification requests [regarding Dr. Patrick] didn't you?
Bowen: Basically, they said they would look into it, and I believe they did. And I don't know who the particulars were, who was involved with it.
Francis: You were uncomfortable with this?
Bowen: Well, in my business if you see something time and again . . . It does make you wonder. It didn't take a rocket scientist to figure out something was amiss. What was this guy up to? I just said, 'This is something people need to keep an eye on.'

R.116, dep. ex. WWW at 13 (Francis's notes from Bowen interview). Bowen said during his deposition that he was not surprised at the number of verification requests he was being shown by Cleveland Scene's counsel. But it is unclear from the transcript of the deposition whether he meant that he was not surprised by the number of requests he was being *shown* at his deposition, given the number that had been made, or that he was not surprised by the gross number of requests *made to him*. Regardless, Bowen confirmed in his deposition that the multitude of verification requests he had received put him on notice that at least some institutions were questioning Dr. Patrick's completion of an emergency medicine residency at Jewish Hospital.

Following his stint at Jewish Hospital, which by Patrick's various accounts ran for anywhere from one to five years ending as late as 1979, Dr. Patrick has practiced at numerous hospitals, both as a staff member and as a doctor hired through staffing services (e.g., Interim Physicians and Medical Doctors Associates). He has twice been removed from, or had his contract not renewed at, hospitals due to, among other things, questions regarding the nature of his claimed residency in emergency medicine at Jewish Hospital, deficient sterilization practices, and patient complaints.

## II.

We review de novo a district court's grant of summary judgment, using the same standard under Rule 56(c) used by the district court. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999)

4

(en banc). We must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The fact that both parties have filed summary judgment motions does not alter the standard by which we review these motions. "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)(quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

Because this case was filed in federal court in Ohio under diversity jurisdiction, we apply the substantive law of Ohio. "Under the *Erie* doctrine, federal courts sitting in diversity apply the substantive law of the forum state and federal procedural law." *Biegas v. Quickway Carriers, Inc.,* 573 F.3d 365, 374 (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Ohio's defamation law is succinctly explained in *Bruss v. Vindicator Printing Co.*, 672 N.E.2d 238 (Ohio Ct. App. 1996):

> In order to establish a claim of defamation, a plaintiff must show that (1) a false statement of fact was made concerning him or her; (2) the statement was defamatory; (3) the statement was written; (4) the statement was published; and (5) in publishing the statement, the defendant acted with the requisite degree of fault . . . . To survive a motion for summary judgment in a libel action, the plaintiff must make a sufficient showing of the existence of every element essential to his or her case . . . . *[M]aterial falsity is an essential element of a libel claim.* In *Natl. Medic Serv. Corp. v. E.W. Scripps Co.* . . . the court, in construing falsity as an element in a libel action, noted that Professor Prosser has stated: "It is sufficient [in defending against a defamation action] to show that the imputation is substantially true, or as it is often put, to justify the "gist," the "sting," or the substantial truth of the defamation." The Ohio Supreme Court has held that it is for the court to decide as a matter of law whether certain statements alleged to be defamatory are actionable or not.

5

*Bruss,* at 240-241 (internal citations omitted) (emphasis added) (abrogated in part on other grounds by *Welling v. Weinfeld*, 866 N.E. 2d 1051 (Ohio 2007)).

The district court concluded that Dr. Patrick had the burden of establishing the falsity of the Cleveland Scene article by clear and convincing evidence because the matters contained in the article were matters of public concern, and, further, that because Dr. Patrick is a "limited public figure," he had the burden of demonstrating actual malice on the part of the defendants. We do not reach those issues because we conclude that even if Dr. Patrick were simply a private citizen claiming defamation by the media, he would be required to make the threshold showing of falsity, a showing that the district court correctly determined he failed to make.

The district court held that the gist of Playing Doctor is "twofold: the reported character of Dr. Patrick's 1975-1976 residency at Jewish Hospital raised questions about the degree of his participation in and the thoroughness of his residency training; and, Dr. Patrick's representations of his medical training were either exaggerated or inaccurate." *Patrick v. Cleveland Scene Pub. LLC*, 582 F. Supp. 2d 939, 948 (N.D. Ohio 2008). Turning to the first of these two imputations, the court held that Dr. Patrick failed to present evidence of the material falsity of the article's claims that Dr. Patrick's various applications and curricula vitae contained significant inconsistencies regarding the dates, claimed fields of medicine, and position titles (i.e., intern or resident) of his medical training, and of his birth date. Our review of the record confirms that the record contains evidence of numerous inconsistencies. Dr. Gordon Margolin, the Director of the Department of Internal Medicine at Jewish Hospital, had refused to sign Dr. Patrick's residency certificate, saying that he had misgivings about doing so and had asked Dr. Heimlich to sign it on behalf of the hospital. Dr. Heimlich signed that certificate, and confirmed that Dr. Patrick did a one-year residency at Jewish

6

Hospital, but disclaimed knowledge of any residency training program done by Patrick beyond that, thus casting doubt on Dr. Patrick's claims of a residency at the "Heimlich Institute" and a "special residency" supervised by Dr. Heimlich after the year at Jewish Hospital. And while Jewish Hospital confirmed that Dr. Patrick spent the year there as a *surgical* resident from 1975-1976, it has responded to numerous verification requests disavowing any knowledge of his completing an *emergency medicine* residency or receiving any specialized emergency medicine training there. Indeed, Francis's interview notes and the depositions taken in this case show that both Dr. Margolin and Mr. Bowen stated that Jewish Hospital had no residency program in emergency medicine at the time Dr. Patrick was there, but offered residencies only in surgery and internal medicine. This evidence is unrebutted in the record.

The other imputation of Playing Doctor, that "Dr. Patrick's representations of his medical training were either exaggerated or inaccurate," is similarly supported by the record evidence. The record demonstrates many inconsistencies in Dr. Patrick's representations of virtually all aspects of his medical training, including: the title (i.e., intern or resident), medical field (i.e., emergency medicine or surgery), location (i.e., Jewish Hospital, University of Cincinnati, or the Heimlich Institute) and year and duration (i.e., various years and time periods between 1974 and 1979) of his residency. The district court held that Dr. Margolin's refusal to sign Dr. Patrick's residency certificate, Dr. Heimlich's disclaiming any knowledge of Dr. Patrick's training beyond the one year at Jewish Hospital, and Jewish Hospital's refusal to certify that — contrary to Dr. Patrick's claims — he had obtained any training in emergency medicine while there, together with inconsistencies in Dr. Patrick's own documents, demonstrate that the gist of Playing Doctor is substantially true. And the record supports the district court's conclusion that although Dr. Patrick made some attempt

7

to rebut this evidence, the rebuttal evidence is wholly insufficient to make the showing of falsity necessary to survive summary judgment.

Because Dr. Patrick failed to make a showing of an essential element of his defamation claim — i.e., that the gist of <u>Playing Doctor</u> is false — he cannot survive the defendants' motion for summary judgment. The district court therefore did not err in granting summary judgment to the defendants and dismissing the complaint.

### III.

For the foregoing reasons, we **affirm** the judgment of the district court.