# United States Court of Appeals
## For the First Circuit

No. 23-1633

THOMAS C. FRANCHINI,

Plaintiff, Appellant,

v.

BANGOR PUBLISHING CO., INC., d/b/a/ Bangor Daily News;
MEG HASKELL; EDWARD MURPHY; GANNETT COMPANY, INC., d/b/a
USA Today; DONOVAN SLACK; INVESTOR'S BUSINESS DAILY, INC.,
d/b/a Investor's Business Daily; MTM ACQUISITION, INC., d/b/a
Portland Press Herald and SALLY PIPES,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before*

Lynch, Circuit Judge,
and Saris,** District Judge.

---

\* Judge Torruella heard oral argument in Franchini v. Investor's Bus. Daily, Inc., No. 19-1389, 2024 WL 229053 (1st Cir. Jan. 17, 2024), an interlocutory appeal in this case, and participated in the initial semble thereafter. His death on October 26, 2020, ended his involvement in this case. The remaining two panelists issued this opinion pursuant to 28 U.S.C. § 46(d).

\*\* Of the District of Massachusetts, sitting by designation.

Raymond W. Belair, with whom Belair & Associates, P.C., was on brief, for appellant.

Clifford H. Ruprecht, with whom Roach Ruprecht Sanchez & Bischoff was on brief, for appellees Gannett Company, Inc., and Donovan Slack.

Russell B. Pierce, Jr., with whom Norman, Hanson & DeTroy, LLC was on brief, for appellee Investor's Business Daily.

Christopher T. Uphouse, with whom Eaton Peabody was on brief, for appellees Bangor Publishing Co., Inc., and Meg Haskell.

Cynthia L. Counts, with whom Rachel Wertheimer, Verrill Dana LLP and FisherBroyles LLP were on brief, for appellees MTM Acquisition, Inc., Edward Murphy, and Sally Pipes.

_____

July 17, 2024

_____

**LYNCH**, **Circuit Judge**. Dr. Thomas C. Franchini, the former Chief of Podiatry at the Department of Veterans' Affairs Maine Healthcare System at Togus ("VA Togus"), appeals from the district court's grant of joint motions for summary judgment to defendant publishers Bangor Publishing Co., Inc., d/b/a Bangor Daily News; Gannett Company, Inc., d/b/a USA Today; Investor's Business Daily, Inc., d/b/a Investor's Business Daily ("IBD"); and MTM Acquisition, Inc., d/b/a Portland Press Herald; and reporters Meg Haskell, Edward Murphy, Donovan Slack, and Sally Pipes.

Franchini brought suit against the defendants alleging that articles the defendants had written and published, which described malpractice allegations as to his medical treatment of veterans at VA Togus, were libelous and/or defamatory. Franchini v. Bangor Publ'g Co., 560 F. Supp. 3d 312, 316 (D. Me. 2021).[1]

He argues on appeal that the district court (1) should have denied the defendants' motion for summary judgment because there were at least genuine issues of material fact as to whether he was a voluntary or involuntary public figure and (2) should not have dismissed his Second Amended Complaint ("SAC") for failure to plead actual malice. We hold on the undisputed facts that the

---

[1] In addition to his allegations of libel and/or defamation against all defendants, he also alleged that all defendants had caused negligent infliction of emotional distress and that Gannett and Slack had engaged in fraudulent or negligent misrepresentation. Id. Franchini has not appealed the dismissal of those claims.

district court correctly found that Franchini was a voluntary public figure and that he failed to plead actual malice in his SAC. We affirm the judgment of the district court.

**I.**

We describe the undisputed facts of record. The U.S. Department of Veterans' Affairs ("VA") is responsible for "administer[ing] the laws providing benefits and other services to veterans and the dependents and the beneficiaries of veterans." 38 U.S.C. § 301(b). Both before and during Franchini's employment at VA Togus, the VA's struggle to provide quality medical care nationally to all veterans who seek it had been the subject of vigorous public debate. That has been true since at least the 1990s.[2] Within Maine specifically, media coverage since the late

---

[2] The district court referred in its opinion to a systematic literature review of more than 200 articles "comparing the quality of medical and surgical care provided by the VA to relevant non-VA healthcare facilities and systems," which noted that "[t]he quality of care provided by the VA has been subject to debate since, and well before, the VA's system transformation starting in the mid-90s. Media and entertainment vehicles have, rightly or wrongly, not infrequently portrayed VA care in less than optimal light, although there have been notable exceptions." Paul G. Shekelle et al., Comparison of Quality of Care in VA and non-VA settings: A Systematic Review, at iv (Sept. 2010), https://pubmed.ncbi.nlm.nih.gov/21155199/ [https://perma.cc/6ZGN-QBAV]. The court also noted in its opinion the following articles: Associated Press, Rating Group Finds Veterans' Hospitals Lagging in Quality, N.Y. Times, June 4, 1990, at A21 (reporting that "veterans' hospitals were at least 20 percent more likely than others to fall below quality standards in emergency services, special care, surgery and anesthesia, surgical case review, alcohol and drug treatment planning and fire safety"); Robert Pear, Report Outlines Medical Errors in V.A. Hospitals, N.Y. Times, Dec.

1990s and early 2000s has highlighted the quality of care available at VA Togus, Maine's only VA hospital.[3] Congress, too, became concerned about the quality of care at VA Togus. In the mid-2000s, federal lawmakers publicly discussed the VA's challenges in providing healthcare to veterans in Maine. On March 10, 2004, Tom Allen, a then-Representative to the U.S. House from Maine, stated that "the crisis facing VA health care," created by insufficient funding and increased demand, was "amplified" for "[v]eterans in

_____

19, 1999, at 1 ("Federal investigators have documented almost 3,000 medical mistakes and mishaps in less than two years at veterans hospitals around the country [between June 1997 and December 1998], and more than 700 patients have died in those cases, the Department of Veterans Affairs says in a new report."); David Stout, Bush Promises Help to Veterans Who Face Health-Care Backlog, N.Y. Times, Aug. 20, 2001 (quoting President George W. Bush as stating, "[c]urrently, there are about 600,000 pending applications" to receive VA healthcare, "of which 53,000 have been pending over a year"); Milt Freudenheim, V.A. Health Care Strained by Big Wave of Enrollees, N.Y. Times, Apr. 6, 2002, at A1 (noting that "in some parts of the country, thousands of [veterans] are waiting years to see a V.A. doctor"); Susannah Rosenblatt, VA Health System Failing, Survey Says, L.A. Times, July 15, 2003, at 18 (reporting "[v]eterans are waiting six months or more for medical care as a severely overburdened Veterans Affairs health system fails to keep pace with growing demand").

[3] The district court noted in its opinion the following articles: Doug Kesseli, Veterans Seek Service Improvements, Bangor Daily News, May 15, 2004, at C1; Josie Huang, For Veterans, Health Care on Hold; VA Staffing Shortages, Limited Space and a Spike in Enrollment Force Many to Wait a Year for a First Exam, Portland Press Herald, Jan. 19, 2003, at 1B; VA's Uneven Health, Bangor Daily News, March 19, 2002, at A8; Michael O'D. Moore, Doctors, Veterans Voice Medical Care Concerns, Bangor Daily News, Aug. 3, 2000; Bill Nemitz, For Some Veterans, The Battles Go On, Portland Press Herald, May 30, 1999; Paul Kane, Hearing Reveals Togus Problems, Bangor Daily News, Sept. 26, 1998.

rural States, such as Maine," who also must "travel hundreds of miles to the nearest VA facility." On August 22, 2005, the U.S. House of Representatives' Committee on Veterans' Affairs Subcommittee on Health ("Health Subcommittee") met in Bangor, Maine, and discussed the "challenges the VA confronts in providing care for veterans in the state," challenges which included "budget cuts," "staff shortages," and "significant delays in . . . orthopedic care." On October 3, 2007, in a hearing before the U.S. Senate Special Committee on Aging, Senator Susan Collins spoke about the VA's challenges in providing health care to veterans in Maine, including the need for funding to "ensure that it has the specialists that many of our veterans need."

Public discussion of the quality of VA care nationally and in Maine continued into the next decade in both newspaper articles and congressional hearings.[4] Then VA Undersecretary for Health David Shulkin said in a prepared statement, "[t]he year 2014 was one of the most significant times in VA's history. To

_____

[4] The court also noted in its opinion the following articles: Charles Eichacker, Veterans Look Ahead to a Future with Trump, Portland Press Herald, Nov. 13, 2016, at 2B; Michael Shepherd, Pingree: VA Should Fire Contractor Managing Troubled Care Program, Bangor Daily News, Apr. 28, 2016; Michael Shepherd, Many Maine Veterans Still Waiting for Timely Health Care, Bangor Daily News, Jan. 28, 2016; Michael Shepherd, Watchdog Ties Togus to National VA Scandal, Portland Press Herald, June 18, 2015, at 1A; Michael Shepherd, New Togus Patients Wait Longer, Morning Sentinel (Waterville, Me.), May 16, 2014. Congressional hearings were held in January 2015 and April and September 2016.

say that we had a crisis on our hands would be an understatement." A prepared statement by Carl Blake, Associate Executive Director for Government Relations at Paralyzed Veterans of America, given at a January 2015 Health Subcommittee hearing titled "Examining the Quality and Cost of VA Healthcare," "recognize[d] that there is much debate underway about the quality of care being delivered at VA medical facilities around the country."

In April 2004, Franchini, a board-certified foot and ankle surgeon, was hired and began work at VA Togus, holding the title of Chief of the Department of Podiatry ("COP"). Franchini previously served as a surgical podiatrist and active-duty officer with the Navy from August 1992 to August 2002, after which he served six additional years in the Naval Reserve, and was a clinical professor at Fletcher Allen Medical Center in Vermont from 2002 to 2003. While in the Navy, he attained the rank of lieutenant commander and participated in more than 4,800 surgeries.

Franchini testified that he had sought employment at VA Togus "[b]ecause of the honor" and to improve his "retirement scenario." The podiatry department at VA Togus during Franchini's tenure consisted of Franchini, two other podiatrists who "were a lot older than [he] was", a podiatry technician and a scheduling clerk who was shared with two other departments. It was the

busiest of VA Togus's departments providing surgical services, treating more than 5,000 patients annually.

Franchini alleges the COP title was "nominal, ceremonial and non-supervisory" and that he "was never in any 'leadership' position, never had any supervisory responsibilities, policy making position or any other control beyond that of any staff podiatrist." The testimony of two other former VA Togus podiatrists, one of whom also held the position of COP, supports this assertion. Franchini also testified that he "was not running anything" as COP, that all real authority lay with Dr. Robert Sampson, VA Togus's Chief of Surgery, and that Franchini's role was only to act as Dr. Sampson's "eyes and ears at different committee meetings and different committees."

Even accepting those allegations as true, documents in the record show that on paper, the VA New England Healthcare System's Performance Plans for a COP for the fiscal years 2006 and 2007 contained "Performance Measures" and "Key Core Competencies,"[5]

---

[5] These included "[m]aintain[ing] effective relations with the public and media, which results in a positive image of VA in the network or the community"; "[o]perat[ing] an effective program to receive, evaluate and resolve patient-initiated complaints"; "[t]rack[ing] data to identify and correct systemic issues"; "improv[ing] veteran and family satisfaction with VA care by promoting patient centered care and excellent customer service"; "[a]llocat[ing] resources, staff, equipment and plant, in an effective manner responding to changes in budget plan, construction issues, VHA and Network priorities, etc."; and "[b]alanc[ing] various stakeholder needs, including those of

- 8 -

which formed a performance review framework for Franchini's performance reviews by Dr. Sampson in those years. In fiscal year 2006, Franchini himself also provided Dr. Sampson a list of eight "performance bullets" detailing his accomplishments as COP, which were incorporated into a three-step "special advancement for performance" for Franchini resulting in an approximately $10,000 pay raise for him. According to Franchini, Dr. Sampson also provided oral instructions to Franchini about his role as COP when he first started, which were "to see patients, see patients well, make them happy, and play well in the sandbox."

In 2009, Franchini was removed from the COP position and became a Staff Podiatrist.[6] A proficiency report covering the period from 2008 to 2009 prepared by Dr. Sampson and approved by Dr. Timothy Richardson, VA Togus's chief of medical staff, gave Franchini an overall rating of "low satisfactory," with a "low satisfactory" rating in "clinical competency," which "includes examination, diagnosis, therapeutic ability, effectiveness in emergencies, patient management, consultations, specialty skills and record keeping." The "narrative summary" section stated, "[d]uring this evaluation period Dr. Franchini seemed to lose some

---

patients, staff, affiliates, Labor Partnership and Veteran Service Organizations to optimize outcomes."

[6] Franchini maintains that he was removed because he "didn't want to do committee meetings anymore" on Dr. Sampson's behalf.

of his enthusiasm for the mission of treating veterans. His position was changed from Chief of Podiatry to Staff Podiatrist."

On December 10, 2009, Dr. Richardson received a written communication from a VA staff compensation and pension disability manager raising concerns about the quality of care being provided by a staff podiatrist at VA Togus. As a result, the VA began a review of Franchini's performance in early 2010.

On March 29, 2010, Dr. Sampson and Dr. Richardson asked Franchini to "voluntarily suspend performance of all surgical procedures" as they performed "a focused review of 25 patients" whom Franchini had treated; Franchini testified that he continued working as a podiatrist at VA Togus after this meeting. On April 28, 2010, Franchini was summarily suspended and placed on a leave of absence by the VA Togus Professional Standards Board.

Dr. Richardson informed Franchini in a June 17, 2010, letter that:

> [a] focused review of the surgical care provided by you was initiated following several Veteran complaints of poor surgical outcomes and a concern by a medical staff provider that Veterans had undergone surgery after "minimal evaluation." The Chief of Surgery reviewed 25 randomly selected medical records and identified significant deficiencies in the clinical care that you provided. You were notified regarding this preliminary review on March 29, 2010; and you were informed that additional reviews would be performed.

Another VA doctor's review "identified deficiencies similar to those identified by Dr. Sampson." After both reviews were "presented to the [VA Togus] Professional Standards Board," Franchini was notified on April 28, 2010, "of its decision to 'summarily suspend' [his] privileges," "that aspects of [his] clinical practice did not appear to meet accepted standards of practice and could potentially constitute an imminent threat to patient welfare," and "that issues of possible incompetence in performing granted privileges would require further investigation." Franchini was then "placed on administrative leave with pay." After a third VA doctor reviewed Franchini's record of care and concurred with the other doctors, concluding "that the majority of the cases he reviewed were 'below the standard of care,'" the Professional Standards Board recommended "revocation of [Franchini's] clinical privileges and [his] removal from Federal service." Franchini was given notice of this. The June 17, 2010, letter informed Franchini that he "ha[d] the right to reply to this notice orally or in writing, or both orally and in writing, and to submit any affidavits and other documentary evidence in support of [his] reply, showing why this notice [wa]s inaccurate and any other reasons why [his] removal should not be effected." On October 29, 2010, Franchini, in a reply letter from his attorney, argued against the revocation of his privileges, and

referred to and incorporated "review[s] by two health care providers who specialize in foot and ankle surgery."

Rather than continue to fight his removal, on November 8, 2010, Franchini resigned from VA Togus. The official VA notification of personnel action recording Franchini's resignation, dated November 8, 2010, noted that Franchini's stated "reason for resignation" was "personal reasons," but that the "agency finding" was he had

> resigned after receiving written notice on [June 16, 2010,] of proposal to []separate[] for A) repeated surgical cases in which non-operative alternatives were not employed resulting in inadequate informed consent for surgery and probable unnecessary surgical procedures; B) repeated surgical cases in which pre-operative evaluation was either missing, inadequate, or contradicted by studies performed; again making it probable that unnecessary surgery was performed; C) repeated surgical cases in which post-operative follow-up care was inadequate; D) repeated examples of inadequate surgical procedures leading to poor outcomes, and no evidence of patient disclosures when indicated.

Franchini's resignation letter dated November 8, 2010, stated that his resignation was "not an admission of any wrongdoing on [his] part" and was due instead to his "concerns about [his] own health and the cost (both personal and financial) of proceeding with a hearing." Franchini then entered private practice in the Bronx, New York.

VA Togus Director Brian G. Stiller responded in a November 19, 2010, letter which informed Franchini that his resignation letter had been received and notified him that VA Togus was "making a review of the concerns raised regarding [his] clinical practice" and that the results of this review would inform whether VA Togus would report Franchini "to the appropriate State Licensing Boards."

On November 27, 2012, VA Togus sent letters to the State Licensing Boards of Maine, New York, Rhode Island, Vermont, and Washington, D.C., to inform them that "there [wa]s substantial evidence that [Franchini] so significantly failed to meet generally-accepted standards of clinical practice so as to raise reasonable concerns for the safety of patients when during his clinical practice as a podiatrist, he made multiple diagnostic and treatment errors."

This, in turn, triggered further congressional inquiry. In a January 23, 2013, letter to Eric Shinseki, then Secretary of the VA, Jeff Miller, the Chairman of the U.S. House Committee on Veterans' Affairs, stated that, "[a]s the leaders of the U.S. House of Representatives Committee on Veterans' Affairs, we are very concerned about how the Department of Veterans Affairs (VA) has characterized the podiatry issue at the VA Maine Healthcare System in Togus, Maine," and asked for additional information on this matter. On March 1, 2013, Robert Petzel replied on behalf of

Secretary Shinseki, noting that an October 17, 2012, "internal clinical document" recommended that the VA "notify those Veterans identified as having potential, probable, or actual harm after a careful review of their medical records," due to medical care provided to them by "a podiatrist previously employed at" VA Togus and "offer them in-person, follow-up examinations . . . . intended to determine the extent of harm, if any, that may have been caused by the former VA [Togus] podiatrist." A "record review of the VA [Togus] podiatrist's clinical care . . . identified 286 total patients who required additional clinical evaluation," at which point the "VA began to notify patients and provided a consolidated report of events to Congressional Committees and offices."

VA Togus then notified before 2013 the twenty-five patients involved in its 2010 review of Franchini that they may have received substandard care from him. In 2013, the VA sent a "second wave" of letters to more of Franchini's former patients.

On April 29, 2014, The Forecaster, a Maine publication, published a story by David Harry titled, "South Portland veteran fights VA to file damage claim," in which one of Franchini's former patients, Kenneth Myrick, alleged Franchini had provided him with "substandard care" and "said he also fear[ed] 80 or more other patients treated by Franchini [wer]e also suffering because of the care they received." The article discussed whether Myrick would be able to recover damages through a federal tort claim and stated

"legal precedent is not on his side" due to the time elapsed between his receipt of treatment and attempt to seek relief. The article also described how Myrick was contacted in 2013, "almost 2 1/2 years after [Franchini] left" VA Togus, by Dr. Richardson and other hospital administrators at VA Togus "to discuss the Dr. Franchini podiatry disclosure case," and that another VA Togus doctor concluded after subsequent re-evaluation that "the lack of success of [Myrick's surgical treatment] is due to a sub-standard performance of the procedure." It further discussed inquiries Myrick made to Senator Collins' office. Franchini testified that he had contacted Harry to "ask[] him to remove [the article]" or "redact[] [his] name" "because it was filled with lies," a request which Harry refused. The Forecaster did not remove or disavow the article. Franchini has not named The Forecaster or Harry as defendants in this action.

Between 2014 and 2017, seven of Franchini's former patients, including Myrick, brought claims against the United States under the Federal Tort Claims Act in the District of Maine, seeking damages as a result of the treatment each had received from Franchini at VA Togus (the "FTCA cases"). See Wood v. United States, No. 14-cv-00399, 2016 WL 11580579 (D. Me. Feb. 2, 2016); Mansir v. United States, 299 F. Supp. 3d 203 (D. Me. 2018); Prescott v. United States, No. 14-cv-00551, 2018 WL 1036387 (D. Me. Feb. 23, 2018); Myrick v. United States, No. 15-cv-00045, 2018

- 15 -

WL 1037641 (D. Me. Feb. 23, 2018); Korsiak v. United States, No. 15-cv-00220, 2018 WL 1037640 (D. Me. Feb. 23, 2018); Downs v. United States, No. 15-cv-00525, 2018 WL 1036388 (D. Me. Feb. 23, 2018); Carpenter v. United States, No. 18-cv-00128, 2019 WL 1006230 (D. Me. Feb. 28, 2019).[7] All of these suits are public records, as were the congressional proceedings. Multiple public filings in the FTCA cases named Franchini and identified him:

- an exhibit titled "Institutional Disclosure of Adverse Event," in which the VA documented its 2013 disclosure of "sub-standard care" that Franchini provided to the veteran bringing suit, April Wood;[8]

- the March 10, 2017, deposition testimony by former VA Togus medical director Ryan Lilly acknowledging that "Dr. Franchini's care" of six of the seven FTCA plaintiffs "fell below the acceptable standards;"[9]

---

[7] Of the FTCA Cases, Carpenter and Korsiak were dismissed for lack of jurisdiction and the remaining cases settled. See Carpenter v. United States, No. 18-cv-00128, 2019 WL 2871140, at *4 (D. Me. July 3, 2019); Korsiak v. United States, No. 15-cv-00220, 2018 WL 1037640, at *8 (D. Me. Feb. 23, 2018).

[8] This exhibit was first docketed on April 6, 2015. See Exhibit Ex A: Institutional Disclosure of Adverse Event, Wood, 2016 WL 11580579 (No. 14-cv-00399).

[9] This deposition was first docketed on August 30, 2017. See Exhibit 8 Lilly Depo Transcript, Wood, 2016 WL 11580579 (No. 14-cv-00399).

- an exhibit titled, "VA Issue Brief," which chronicled Franchini's resignation from VA Togus and subsequent actions taken by the VA to investigate instances of substandard care he provided;[10]

- the January 20, 2017, deposition testimony of Dr. Sampson, in which he testified that he knew Franchini was a "dangerous surgeon" after he had concluded his initial review of twenty-five of Franchini's cases;[11] and

- a declaration from VA Director of Risk Management Yuri Walker in which she reiterated her conclusion from her April 30, 2012, Memorandum for the Record that "it appeared in some instances that Dr. Franchini was 'actively falsifying some medical records'" and clarified "that conclusion was based entirely upon the review team's review of patient medical records, and nothing else."[12]

Further, Franchini was initially named a defendant in Carpenter before the United States was substituted for him individually.

---

[10] This exhibit was first docketed on August 30, 2017. See Exhibit 4 Issue Brief, Wood, 2016 WL 11580579 (No. 14-cv-00399).

[11] This deposition was first docketed on August 30, 2017. See Exhibit 5 Sampson Depo Transcript, Wood, 2016 WL 11580579 (No. 14-cv-00399).

[12] This declaration was first docketed on September 27, 2017. See Affidavit of Yuri Walker, Wood, 2016 WL 11580579 (No. 14-cv-00399).

On February 2, 2016, the federal district court of Maine issued an order in the then-pending FTCA cases which referenced Franchini by name sixty-four times. See Wood, 2016 WL 11580579. This order addressed a pending motion to dismiss for lack of subject matter jurisdiction, and explicitly stated that the court "reach[ed] no conclusions as to whether Dr. Franchini's treatment of the plaintiffs was negligent, as the plaintiffs claim." Id. at *1.

Franchini stated he learned of the FTCA cases in late February 2016 when his then-employer presented this order to him after discovering it via the employer's internet search. His employer then terminated Franchini's employment. Franchini stated this was due to the employer's concern that it would generate "bad publicity" for his practice.

In May 2016, Franchini, acting pro se, sent the Maine federal district court a "Request" to "remove the link of [his] name to" the February 2016 Order because "a google search based on [his] name" yielded the Order. The district court denied Franchini's request, stating the "Order ha[d] been in the public domain for approximately three months," "Dr. Franchini[']s name appears numerous times in each of the parties['] briefs which are part of the public record of this proceeding," and "[h]is name is also associated with this proceeding in documents that are available on the internet and easily identified through the use of

a search engine." The court concluded that "[t]he relief that Dr. Franchini has requested will not disassociate his name from this proceeding," and further was "not otherwise persuaded that good cause exists for the same." Franchini also submitted a sworn declaration in the FTCA litigation on September 19, 2017, denying that he had ever "lied to a patient about" or "fraudulently concealed" information on any patient's condition and asserting he never "provided substandard care."[13] Both of those submissions by Franchini became part of the public record.

Even before he filed the declaration in the named cases, Franchini created a blog on June 27, 2016, entitled "Foot and Ankle Forum." His first blog post, published that same day, began with the sentence, "[t]his is an overview on events in my life and what it has on what occurred [i]n the VA system." In the post, he stated that he "worked at the VA in Maine [f]or 6 years and 7 months," where he received "[m]ultiple salary raises" and "dozens of accolades from patients as well as coworkers." He explicitly addressed the VA's investigation of him, stating that "[a]fter 6 years of positive work with no complaints from anyone . . . one patient complained which le[]d to a review," which "focused in on [his] notes" and "never allowed [him] to explain." Franchini

---

[13] Franchini testified that this affidavit was both requested and prepared by John Osborn, the Assistant United States Attorney defending the government in the FTCA cases, and that Franchini "reviewed it to make sure everything was correct."

stated that "after over a year" of investigation he "rebutted all issue[s]," and that "then based on th[e] fact that [the VA] could not [f]ind something that was wrong other than brief note taking[,] [t]hey thought it would be a good idea to contact over [a] hundred people [t]hat [he] did surgery on and ask them if there was a problem." He stated that this outreach inspired former patients who "we[]re silent for years" to "c[o]me forward" because "they thought that this could be [b]eneficial[] in some w[a]y now [that] they had issues." He stated that he "wanted [it] to be explained [h]ow can anyone resurrect issues after a prolonged period of [t]ime" and then stated that "these old complaints were unable to proceed" due to "statute of limitation or a statute of repose." He went on to state that "people change[,] [w]e get older heavier weaker stronger sicker healthier" and "[t]hat is why there is a limitation [b]ecause life gets in the way of events of this nature" and "[w]hat is good today cannot be a guarantee that th[r]ough[]out your life things change." He concluded the blog post by asking for "[y]our thoughts."

Franchini testified that his "sole purpose" in creating the "Foot and Ankle Forum" blog was "to set the record straight, to deny the allegations that were set forth in the" February 2016 Order, and "to counteract" the allegations in case any potential employers saw the order "when [he] was seeking a new job." However, when asked why he "continued to blog on a variety of other

- 20 -

topics all related to podiatry," he stated "the other blogs were just for content."

Franchini made a total of eleven blog posts on the blog from June 2016 to October 2016 which detailed his thoughts on the state of healthcare in the United States and his political views. In a blog post on June 28, 2016, he wrote that he "[w]ill start writing daily on topics of interest" and that "[t]oday will be the first in a series of topics which will [i]nclude medicine surgery politics religion etc."  He again asked the audience for "[y]our thoughts."  On the same day, he wrote another blog post titled "Dr Thomas C Franchini thoughts on jobs in podiatry" in which he sought "[y]our thoughts" from "f[e]llow doctors on podiatry and in general medicine decline in the United States."[14]

In November 2017, the House Committee on Veterans' Affairs Subcommittee on Oversight and Investigations held a

---

[14]    Franchini testified that he had attempted to take down and delete the blog after making a final entry in "late October [or] November" 2016 but realized that it was still accessible in October 2017 "after the libel publications," and he successfully deleted it.  On October 12, 2017, the June 27, 2016, blog post received a comment from an individual claiming to have "worked side by side with Dr. Franchini" at a naval hospital "years ago" and who "found him to be a great surgeon, extremely compassionate about treating patients."  Franchini claims "no one ever read th[e] blog before the publication of the defamatory stories."  The record shows that the blog was directly quoted in the first of the allegedly defamatory articles to be published, which indicates the blog was accessed by that article's author, and that the blog was accessible as late as February 8, 2018, and had five followers at that time, when it was downloaded.

- 21 -

hearing titled "Examining VA's Failure to Address Provider Quality and Safety Concerns" at which Myrick read a statement into the congressional record regarding the care he received, stating that "trust and faith in the VA . . . . have been shattered for myself and the 87 other Maine veterans who received substandard care from Dr. Thomas Franchini at Togus Medical Center in Augusta, Maine." During this same hearing, then-U.S. Representative Bruce Poliquin of Maine described allegations by Myrick, Wood, and other former patients against Franchini, in a statement regarding Poliquin's concern about mismanagement of malpractice allegations at VA Togus. Later on in the hearing, Poliquin stated, "Thomas Franchini. Make sure everybody knows who he is."

In the fall of 2017, several publications ran stories about VA Togus healthcare which were critical of Franchini's practice there and which form the basis of the instant suit. On October 1, 2017, defendant MTM Acquisition, Inc. published in the Portland Press Herald an article written by defendant Murphy titled, "Maine veterans given substandard care are told it's too late to sue" ("Portland Press Herald article"). This article described what was in the federal court public record in the FTCA cases and several of the plaintiffs' allegations of substandard care against Franchini, focusing on the allegations made by Wood. It also referenced Walker's testimony in the FTCA cases that Franchini had falsified records and cited a VA spokesman who had

stated that Franchini had "resigned from the VA after the agency told him to step down or he would be fired in early 2010." The article stated that Franchini had declined to comment for the article through a representative of his office in New York. The article directly quoted excerpts from Franchini's blog. The article discussed the allegations against Franchini within the context of the broader controversies surrounding the VA generally and VA Togus in particular, stating, "[t]he suits come against a backdrop of sharp criticism of the Department of Veterans Affairs over the standards of care given to veterans, including issues such as monthslong wait lists for care and mismanagement that led to veteran deaths," "[v]ets and politicians have been critical of the quality of the care provided by the VA nationwide," and "[i]n 2016, care at Togus was rated 2 on a 5-point scale, with 1 the lowest rank and 5 the highest."

On October 11, 2017, defendant Gannett Company, Inc. published in its newspaper USA Today an article co-written by defendant Slack and Michael Sallah titled, "VA conceals shoddy care and health workers' mistakes" ("USA Today article"). This article detailed how the VA as a whole responded to problems it identified while investigating its medical providers, stating that "[a] USA TODAY investigation found the VA -- the nation's largest employer of health care workers -- has for years concealed mistakes and misdeeds by staff members entrusted with the care of veterans."

As part of USA Today's investigation, the article stated it had reviewed "hundreds of confidential VA records, including about 230 secret settlement deals never before seen by the public."  It specifically reported on the VA's review of Franchini's care, and the allegations made against him, stating that "the VA concluded" he had "made mistakes that harmed veterans" in "88 cases" yet he had been allowed by the VA to "quietly resign and move on to private practice."  It also connected Franchini's case to other problems faced by the VA, noting that "[t]he VA has been under fire in recent years for serious problems . . . including revelations of life-threatening delays in treating veterans in 2014 and efforts to cover up shortfalls by falsifying records."

The USA Today article included comments that Franchini made in an interview with Slack.  It stated:

> In an interview with USA TODAY, Franchini denied making mistakes and said he never got to respond to all of the VA's findings.  When the VA placed Franchini on leave after finding problems with a small sample of his cases in 2010, his attorney submitted two outside reviews saying the VA's findings were not backed up by the medical records.
>
> The VA eventually reviewed nearly 600 of his surgeries from his six years at Togus.  The 56-year-old podiatrist said several doctors were in the operating room with him, and no concerns were raised at the time.
>
> Since leaving the VA, Franchini said, he has performed numerous surgeries without complications.

"If I was so bad, I would be bad all the time," he said.

Franchini later testified that he had "urged [Slack] to report what [he] deemed the real story" behind the VA's investigation into his medical practice at VA Togus. Indeed, he went further and stated that the investigation was a "witch hunt" that was "motivated by the corruption of Drs. Sampson and Richardson." He also "sought to convince [Slack] not to publish the name of [Franchini's then-current] employer." Franchini also testified that his "principal purpose of talking to Donovan Slack was the fact that she threatened [him] over the telephone and said that if [he] did not speak to her, that [the article] would be more damning" for him. However, his claim for fraudulent or negligent misrepresentation in his First Amended Complaint ("FAC") relied on his claim that he had "agreed to the interview subject to the condition, inter alia, that Gannett/Slack not identify the location of his then-current employer," a "representation/commitment [that] was false."

In a declaration filed in opposition to the defendants' motion to dismiss his SAC in this case, Franchini stated that when he met with Slack, he told her that Dr. Sampson "had been directed by his supervisor, Dr. Timothy Richardson, to find a way to get rid of me" and that Dr. "Sampson was later forced to resign because, despite Dr. Richardson's urging, he had been unable to

find anything in his review, except that my assessments were fine and my surgical practice was also excellent, but that my notes were too brief." He further stated that he "believe[s], but ha[s] no personal knowledge, that Dr. Sampson may have been concerned that I might be in a position to take over his position, because of physical injury" due to "a chain saw accident in which some of [Dr. Sampson's] digits were severed." He stated "concern that all of the time wasted pursuing the baseless claims against me were not boding well for Dr. Richardson, who was later removed for these reasons." He stated that he told Slack "that shortly before Dr. Richardson was removed for wasting money on pursuing me baselessly . . . he came up with a plan to reach out to . . . hundreds of patients on [a] 'list' [compiled by Dr. Sampson] to advise that they may have been damaged by my surgeries and that they should come in for 'free evaluation.'" He further stated when patients arrived for these evaluations, "they would be solicited to make claims -- though in reality such claims were both bogus and late under the limitations period -- under the Federal Tort Claims Act based on bogus assertions against me" and that "[s]ince Dr. Richardson, to my certain knowledge, was instructed by VA personal as early as 2009 that nearly all of the patients were beyond the statute of limitations, he thought he had found a way to fabricate an excuse for his fraudulent and futile campaign against me." He stated, "[i]n my opinion [Slack] purposely avoided the truth of

the real story, which was the corrupt action of Dr. Richardson and Dr. Sampson in creating a false narrative to camouflage their corruption."

On October 26, 2017, defendant Bangor Publishing Company, Inc. published in the Bangor Daily News an article written by defendant Haskell titled, "'I never had anything hurt so bad': Veteran harmed at Togus hopes revelations protect younger vets" ("Bangor Daily News article"). This article recounted the reporting in the USA Today article and included further allegations made by Jim Barrows, a veteran who the article described as one of "a group of 88 vets who suffered under the care of Thomas Franchini, a podiatrist at the Togus health center from 2004 until his forced resignation in 2010." It reported that Franchini had "botched" an ankle surgery he performed on Barrows in 2006 by "neglect[ing] to remove a temporary suture" until weeks after the surgery, which "le[ft] the operative site open to infection, inflammation and other complications." It quoted Lilly as stating, "Dr. Franchini resigned in 2010 in lieu of being fired." It also reported on the difficulty of those filing lawsuits to access relief due to statutes of limitations, as well as on changes at the VA generally and VA Togus "to improve care and accountability," and actions by lawmakers "to ensure that this does not happen again."

- 27 -

On December 22, 2017, defendant IBD published an article written by defendant Pipes titled, "VA Negligence is Killing Veterans" ("IBD article"), which criticized the VA for its hiring problematic medical staff, such as "a known sexual predator," "a dangerous felon," and "a physician with a record of more than a dozen cases of malpractice, including the death of a patient." "The agency seems incapable of delivering high-quality care to the patients it serves -- or even holding its employees accountable," she wrote. The article also recounted the reporting from the USA Today article. It cited Franchini as an example of how "[w]hen administrators do find hard evidence of malpractice, they often sweep it under the rug," and stated that "Franchini botched 88 procedures," including "sever[ing] a patient's tendon during one surgery and fail[ing] to successfully fuse one woman's ankle in another," leading to her leg being amputated, but that "Franchini wasn't fired for any of these errors" and was instead allowed "to resign and return to private practice."

## II.

On January 11, 2018, Franchini filed this suit against all defendants seeking recovery for what he alleged to be defamatory statements made in the Portland Press Herald, USA Today, Bangor Daily News, and IBD articles. On February 6, 2018, Franchini filed his FAC, the operative complaint in this case. The defendants made various motions to dismiss the FAC and seek

judgment on the pleadings, with all defendants moving to dismiss Franchini's defamation claims (Counts I, II, III, and IV) and negligent infliction of emotional distress claims (Count VI), and the Gannett defendants also raising arguments to dismiss Franchini's negligent and fraudulent misrepresentation claims (Count V).

In a March 29, 2019, order, the district court granted these motions in part and denied them in part. Franchini v. Bangor Publ'g Co., 383 F. Supp. 3d 50, 55 (D. Me. 2019). It ruled that (1) the matters at issue in Franchini's complaint were matters of public concern, id. at 59, and (2) the FAC failed to allege actual malice because Franchini had not "present[ed] facts sufficient to allow, at the very least, a plausible inference that the speaker 'entertained serious doubts as to the truth of his publication,'" id. (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)), which is "a pre-requisite to any recovery" by a public official or public figure, id. at 58 n.3.[15] Franchini was accordingly not entitled to punitive damages or any presumption of falsity. Id. at 59. The court found all the defendants were entitled to judgment as a matter of law on Count VI and the requests for presumed damages in Counts I, II, III & IV, and that the Gannett

---

[15] Franchini conceded that the court's finding that his FAC failed to plead actual malice was "perfectly correct."

defendants were entitled to judgment as a matter of law on Franchini's request for punitive damages under Count V. Id. at 66. It denied all the other motions.[16] Id.

In September 2019, the court issued a scheduling order to which both parties objected.[17] Based on an agreement made between the parties at a hearing on these objections, the court then established a bifurcated discovery schedule. Phase I of

---

[16] The district court also denied IBD's request to dismiss Franchini's action against it pursuant to California or Maine anti-SLAPP statutes. Id. at 65. IBD timely appealed that decision. The court shortly thereafter ordered a stay of proceedings as to IBD pending resolution of the appeal. On November 13, 2020, this court held that the collateral order doctrine permitted an interlocutory appeal of the district court's order and certified the question to the Maine Supreme Judicial Court ("SJC") as to whether a special motion to dismiss should be granted pursuant to Maine's anti-SLAPP statute. Franchini v. Investor's Bus. Daily, Inc., 981 F.3d 1 (1st Cir. 2020). On February 10, 2022, the SJC declined to answer the certified question. Franchini v. Investor's Bus. Daily, Inc., 268 A.3d 863 (Me. 2022). On January 17, 2024, this court dismissed the interlocutory appeal for lack of jurisdiction following the entry of final judgment in IBD's favor. Franchini v. Investor's Bus. Daily, Inc., No. 19-1389, 2024 WL 229053, at *2 (1st Cir. Jan. 17, 2024).

[17] IBD joined the defendants' objection to the scheduling order, and its counsel appeared at the hearing, despite the stay in proceedings pending resolution of the interlocutory appeal, because it considered the public figure issue separate from the anti-SLAPP argument forming the basis of IBD's appeal.

On September 5, 2019, the district court also held that "dismissal of all claims against Pipes is warranted due to lack of personal jurisdiction and failure to properly serve process. See Fed. R. Civ. P. 12(b)(2) & (5)." Franchini v. Bangor Publ'g Co. Inc., No. 18-CV-00015, 2019 WL 4228885, at *3 (D. Me. Sept. 5, 2019). Franchini challenged this order in his notice of appeal but failed to address this issue before this court.

discovery was limited to developing the necessary factual record for the court to determine whether Franchini had a public official or limited-purpose public figure status. Motions for summary judgment could then follow. When this schedule was set, Franchini expressly acknowledged that a summary judgment ruling that he is a public official or limited-purpose public figure "would be dispositive" as to the defamation claims and preclude the need for Phase II proceedings. The court also extended the deadline for amendment of the pleadings to December 20, 2019. On December 20, 2019, in accordance with this deadline, Franchini filed a SAC.[18] All defendants moved to dismiss or strike the proposed SAC.

On April 15, 2020, the district court granted this motion to dismiss. In its order, the court referenced its previous ruling that any attempt by Franchini to amend his "claims for presumed damages under Counts I-IV, his claims for punitive damages against the Gannett Defendants, and Count VI" "would be futile" and determined that the SAC still did not allege actual malice.

In December 2020, at the conclusion of Phase I of discovery, all defendants moved for summary judgment as to Counts I-IV on the grounds that Franchini was both a voluntary and an

---

[18]    Franchini did not file a motion for leave to explain the purpose of this amendment but asserts on appeal before this court that it was to "set forth the factual basis for the claim of actual malice."

involuntary limited-purpose public figure.  On September 3, 2021, the district court granted the joint motion for summary judgment in a well-reasoned opinion, holding that there was a public controversy which pre-existed the allegedly defamatory publications and that Franchini was a limited-purpose public figure.[19]  _Franchini_, 560 F. Supp. 3d at 328-32.[20]  Franchini timely appeals.

<hr />

[19]   The court found that "[b]eyond Franchini's decision to accept his leadership role at VA Togus . . . other voluntary actions [he] took related to the controversy surrounding the care he had provided at VA Togus bolster a finding that he voluntarily achieved limited public figure status . . . includ[ing]: (1) his 2014 contact with the author of The Forecaster article; (2) his 2016 blogging; (3) his 2016 individual pro se filings in the FTCA Cases; and (4) his meeting with the Defendant Slack."  It noted that Franchini "argue[d] some or all of these voluntary actions fall under the privilege of reply," but held "[i]t is far from apparent that this limited endorsement of the privilege of reply applies to the fact patterns presented on the current record or forecloses the Court from any consideration of Franchini's voluntary actions in the 2014-to-2016 timeframe" and that "[i]n any event, to the extent that the privilege of reply would foreclose [its] finding that Franchini became a voluntary pubic figure," it "consider[ed] whether Franchini may have alternatively achieved limited public figure status involuntarily" and determined that he had.  It thus held "to the extent [Franchini] cannot be viewed as a voluntary public figure, the Court alternatively concludes [he] attained public figure status involuntarily in the time period preceding the Defendants' publications."

[20]   The court granted the motion for all defendants except IBD.  _Id._ at 333.  It denied the motion for IBD without prejudice pending the resolution of IBD's interlocutory appeal.  _Id._ at 326 n.30 ("To the extent that IBD has joined the pending Motion for Summary Judgment, the Court concludes that the ongoing stay and interlocutory appeal prevent the Court from ruling on the merits of IBD's request for summary judgment.  Thus, the Motion shall be denied without prejudice to later renewal as to Defendant

We review de novo the district court's determination that a defamation plaintiff is a public figure. Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 14 (1st Cir. 2011). In the interest of protecting free speech, and "[d]ue in large part to the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,'" Pendleton v. City of Haverhill, 156 F.3d 57, 66 (1st Cir. 1998) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)), the First Amendment of the U.S. Constitution imposes certain limitations on defamation actions, see Cheng v. Neumann, No. 23-1532, 2024 WL 3158513, at *3 (1st Cir. June 25, 2024). These include denying recovery to any plaintiff claiming defamation who is deemed to be a "public figure," unless the plaintiff provides proof that the alleged defamatory statement was made with "actual malice," Gertz v. Robert Welch, Inc., 418 U.S. 323, 327-28, 342 (1974), defined as knowledge of the statement's falsehood or

---

IBD only." (citations omitted)). On June 8, 2022, the district court granted IBD's motion for relief from stay and for entry of summary judgment, holding that "the[] legal conclusions" from its September 3, 2021, order to the other defendants "apply with equal force to IBD's publication and entitle IBD to summary judgment."

Further, on July 5, 2023, the district court in a separate order affirmed the recommended decision of the magistrate judge to affirm Gannett and Slack's motion for summary judgment on Count V (the fraudulent or negligent misrepresentation charge).

reckless disregard for its truth, see St. Amant, 390 U.S. at 729, 731.

Although the public-figure status "inquiry is 'inescapably fact-specific,'" Lluberes, 663 F.3d at 14 (quoting Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 204 (1st Cir. 2006)), "and does not always lend itself to summary judgment," id., it is a legal question "properly resolved by the court, not the jury, regardless of the contestability of the predicate facts," Pendleton, 156 F.3d at 68. Where, as here, the appellant "do[es] not argue that the district court based its status determination on disputed facts," Lluberes, 663 F.3d at 14, it is "perfectly reasonable" for the court to make the legal determination on the undisputed facts pretrial on summary judgment, McKee v. Cosby, 874 F.3d 54, 61 (1st Cir. 2017) (quoting Mandel, 456 F.3d at 204).

Defendants bear the burden of establishing that the plaintiff is a public figure. See Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 592 (1st Cir. 1980). In Gertz, the Supreme Court "delineated three major classes of public figures." Id. at 588. First, "[a]n individual becomes a 'general-purpose' public figure if he [or she] 'achieve[s] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.'" McKee, 874 F.3d at 61 (alteration in original) (quoting Gertz, 418 U.S. at 351). Second, an individual becomes a voluntary limited-purpose public figure if he or she "voluntarily

- 34 -

injects himself [or herself] . . . into a particular public controversy and thereby becomes a public figure for a limited range of issues." Id. (quoting Gertz, 418 U.S. at 351-52). The scope of the voluntary public figure's limited-purpose status is determined by the "nature and extent of [his] participation in the particular controversy giving rise to the defamation." Id. (alteration in original) (quoting Gertz, 418 U.S. at 351-52). Third, an individual can become an involuntary public figure "through no purposeful action of his own," but this is "exceedingly rare." Gertz, 418 U.S. at 345.

The district court correctly concluded that Franchini was a voluntary limited-purpose public figure because the record shows (1) a public controversy existed regarding the adequacy of medical care provided by the VA, and in particular by VA Togus, to veterans, which gave rise to the articles at issue, and (2) Franchini voluntarily injected himself into the issues, at the very least through his blog posts and comments made to USA Today reporter Slack during their interview.[21]

## A. Public Controversy

A public controversy exists when "persons actually were discussing some specific question . . . [and] a reasonable person would have expected persons beyond the immediate participants in

---

[21]    We have no need to and so do not reach the district court's alternative involuntary public figure holding.

the dispute to feel the impact of its resolution." Lluberes, 663 F.3d at 13 (alteration and omission in original) (quoting Bruno, 633 F.2d at 591)). It "must be more than a 'cause célèbre,'" id. (quoting Time, Inc. v Firestone, 424 U.S. 448, 454 (1976)), "or 'a matter that attracts public attention,'" id. (quoting Wolston v. Reader's Digest Ass'n, 443 U.S. 157, 167 (1979)).[22]

Public controversy regarding the quality and availability of medical treatment provided by the VA, and VA Togus in particular, to veterans of the U.S. military existed before, during, and after October 1, 2017, the date that the first allegedly defamatory article was published. This controversy has been the subject of both national and Maine media coverage, as well as congressional hearings. Multiple Maine congressional representatives have spoken specifically about Maine veterans' struggles to obtain healthcare through VA Togus on the public record. Franchini argues he "had nothing to do with the VA's national problems" and "respectfully urge[s]" this court "to take note of the distinction" between the public controversy over the VA's provision of healthcare to veterans, including at VA Togus,

---

[22] Further, the controversy must have existed before the alleged defamation took place "to avoid improper 'bootstrapping,'" id. at 14, whereby "the defendant relies on his own defamatory publication to manufacture a public controversy involving the plaintiff, and thus 'by [his] own conduct, create[s] his] own defense by making the claimant a public figure,'" id. at 18 (alterations in original) (quoting Hutchinson v. Proxmire, 443 U.S. 111, 135 (1979)).

and the VA's investigation of the care he provided as a podiatrist at VA Togus and allegations of substandard care levied against him by former patients whom he treated there. This argument fails. Franchini's actions at VA Togus are inextricably part of the general VA healthcare controversy and the VA Togus inadequacy-of-care issues and cannot be distinguished. Franchini was personally and repeatedly implicated in these controversies by name, including in the 2013 correspondence between VA officials and the House Committee on Veterans' Affairs focusing on "a record review of a VA [Togus] podiatrist's clinical care," the 2014 Forecaster article, the 2014 through September 2017 public filings in the FTCA Cases, one of which originally named him as a defendant, and Judge Levy's February 2016 Order, see Wood, 2016 WL 11580579. These facts demonstrate that "persons actually . . . discuss[ed]" the quality and availability of care at VA hospitals, including VA Togus, and Franchini's role in the issues facing VA Togus, even before October 1, 2017. Lluberes, 663 F.3d at 13. Further, "a reasonable person would have expected" that the dispute over instances of alleged malpractice at VA Togus, as detailed in congressional hearings, media coverage, and the FTCA cases, would impact individuals outside of Congress, VA administrators, and the FTCA cases' plaintiffs: namely, veterans in Maine seeking care, those who care about them and care that U.S. military veterans get adequate medical care, and the public whose tax dollars fund VA

Togus and provide remedies for harm caused by medical malpractice. Id. (quoting Bruno, 633 F.2d at 591).

Franchini makes several additional arguments that "[t]here was no public controversy," all of which also fail. First, the fact that Franchini was no longer employed at VA Togus by the time the allegedly defamatory articles were published and that "[w]hile [he] was at VA Togus (2004 through November, 2010) there was no public media coverage or reportage on any aspect of [his] care or treatment of any patient whom he had treated" does not, as Franchini argues, negate the existence of a public controversy for purposes of the public figure status inquiry. The only temporal requirement of this inquiry is that the public controversy predate the allegedly defamatory statement at issue. See id. at 14. Second, the fact that The Forecaster article and FTCA case filings first reported these allegations, rather than "the mainstream media," does not allow the inference that there was no public controversy. That is especially so because there "ha[d] been a tide of concern and criticism" about the adequacy of medical care at VA Togus. See Gray v. St. Martin's Press, Inc., 221 F.3d 243, 251 (1st Cir. 2000). Third, Franchini argues that the discussion of the VA and VA Togus's issues and failures at providing adequate healthcare revealed a "virtual unanimity of opinion, not controversy." Not so. Further, unanimity of public opinion regarding an issue of concern is, to the contrary, evidence

of the existence, not the absence, of public controversy. See Pendleton, 156 F.3d at 69 (finding that a public controversy existed regarding minority hiring at a school where "students of all hues called for more minority teachers, a recommendation school officials said they would heed" (internal quotation marks omitted)). Fourth, while Franchini argues that "[t]he fact that litigation was brought against the United States under the FTCA based on plaintiff's alleged actions did not result in a public controversy" because "[n]ot all litigation is of 'public or general interest,'" quoting Firestone, 424 U.S. at 455, the FTCA cases are easily distinguishable from Firestone, in which the court held that the high-profile divorce of a wealthy couple was not a matter of public controversy because "the public can have no interest other than satisfaction of its curiosity in the outcome of a divorce proceeding." Bruno, 633 F.2d at 590. The FTCA cases were hardly the sole source which created the public controversies. The many FTCvA cases revealed a pattern of alleged malpractice at VA Togus resulting from Franchini's care.

## B. Voluntary Public Figure

"Once a controversy is isolated, the critical question then becomes whether the plaintiff has attempted to 'influence the resolution' of that controversy." Lluberes, 663 F.3d at 14. A plaintiff who "voluntarily inject[s] himself," Pendleton, 156 F.3d at 69, or "thrust[s himself] into the vortex," Bruno, 633 F.2d at

591, of a controversy and attempts to influence its outcome, as Franchini has done, is a voluntary limited-purpose public figure. This circuit has found such participation where a plaintiff has "ma[de] (and authoriz[ed] the publication of) statements bearing on the" controversy or "s[ought] to influence public opinion" regarding the controversy. See Pendleton, 156 F.3d at 69-70. Actions that "invite[] public attention, comment, and criticism" also constitute voluntary participation. See Bruno, 633 F.2d at 592 (quoting Steaks Unlimited, Inc. v. Deaner, 623 F.2d 264, 274 (3d Cir. 1980)).

Here, Franchini has done voluntarily all these things. On his public blog "Foot and Ankle forum," Franchini created eleven blog posts between June and October 2016, and in some of which he made statements about his role in VA Togus's adequacy-of-care issues in providing competent healthcare to veterans. He did so explicitly in order to "influence public opinion," Pendleton, 156 F.3d at 69, testifying that his "purpose" in creating the blog was to "set the record straight" and "counteract" the public allegations against him, and went even beyond that to cite broader public issues. He also explicitly "invited public attention, comment, and criticism," Bruno, 633 F.2d at 592 (quoting Steaks Unlimited, 623 F.2d at 274), encouraging others to join the discussion by including the line "your thoughts[?]" in multiple posts. Franchini also "voluntarily injected himself" into the

- 40 -

controversy, Pendleton, 156 F.3d at 69, by "urg[ing]" Slack to report what he considered to be "the real story" behind the VA's investigation of his actions at VA Togus and by making statements, some of which were later published, about his actions at VA Togus and the investigation, as well as by charging that there was "corruption" among his superiors at VA Togus, which he alleged was the cause of the investigation of Franchini, in an interview Slack conducted with Franchini while writing the USA Today article.[23]

### C. Invoking the Common Law Privilege of Reply

Franchini further argues that he was not a limited-purpose public figure because, in his view, he simply "defend[ed] himself public[]ly against public accusations." He cites to this court's decision in Lluberes v. Uncommon Productions, LLC, 663 F.3d 6 (1st Cir. 2011) in his defense. But Lluberes does not support him. In that case, the court noted that the "privilege of reply" comes not from the First Amendment, but rather "the common law that governed defamation suits prior to New York Times [v. Sullivan]," and that the plaintiffs were functionally asking the court "to graft the common-law privilege of reply onto the constitutional public-figure analysis." 663 F.3d at 18-19. The

---

[23] Cf. Moody v. NetChoice, LLC, No. 22-277, 2024 WL 3237685, at *12 (U.S. July 1, 2024) ("However imperfect the private marketplace of ideas, . . . a worse proposal [is] . . . the government itself deciding when speech [i]s imbalanced, and then coercing speakers to provide more of some views or less of others.").

court noted that "only one court of appeals has explicitly taken such a step": the Fourth Circuit in Foretich v. Capital Cities/ABC, Inc., 37 F.3d 1541 (4th Cir. 1994).[24]

The Lluberes court did "agree" that "an individual should not risk being branded with an unfavorable status determination merely because he defends himself publicly against accusations, especially those of a heinous character." 663 F.3d at 19 (emphasis added) (citing Pendleton, 156 F.3d at 68); see also Pendleton, 156 F.3d at 68 ("[O]ne does not become a public figure merely by defending oneself publicly against accusations."). But Lluberes explicitly declined to adopt Foretich's holding that the public-figure analysis should exclude defensive statements altogether. Id. at 19 n.12 ("[W]e are reluctant to adopt the reasoning of Foretich outright . . . because this case does not require us to do so and also because its rationale has divided scholars."). Instead, the court concluded

---

[24] In Foretich, the plaintiffs were grandparents who were accused by their daughter-in-law of molesting their infant granddaughter and who made "public comments and appearances" to rebut these accusations. 37 F.3d at 1543-44, 1557-58. Although the Fourth Circuit "acknowledged that some of those rebuttals 'were probably intended (at least in part) to influence the outcome of the custody dispute,'" it found that the plaintiffs were protected under the privilege of reply because their "primary motive was to defend their own good names against [their daughter-in-law's] accusations and . . . their public statements can most fairly be characterized as measured defensive replies to her attacks, rather than as efforts to thrust themselves to the forefront of a public controversy in order to influence its outcome." Lluberes, 663 F.3d at 19 (quoting Foretich, 37 F.3d at 1563).

that even if the privilege were available, it did not apply because "the record [wa]s clear that [the plaintiffs] took little if any [of the actions they claimed were protected] directly in response to" the allegedly defamatory article. Id. at 20. Lluberes further held that even if the "article had some indirect influence on their conduct . . . , that conduct went well beyond any reasonable measure of self-defense." Id.

Assuming arguendo that Franchini's blog posts and his comments to Slack would qualify as "replies," nonetheless, the content of those posts and comments went well beyond the scope of what was "reasonably necessary [for Franchini] to defend himself." Id. at 18; see also Foretich, 37 F.3d at 1560-61 (holding an individual's reply is not privileged if it "exceeds the scope of the original attack, and says more than reasonably appears to be necessary to protect his reputation"). Franchini's blog posts were not limited to defending the medical treatment he provided at VA Togus and disputing the VA's subsequent investigation and its conclusions, but also included his thoughts on the state of healthcare in the United States generally and his political views. In a June 28, 2016, post, he stated his intention to "start writing daily on topics of interest . . . [i]nclud[ing] medicine surgery politics religion etc." When asked why he "continued to blog on a variety of other topics all related to podiatry," he testified "the other blogs were just for content." Even within his original

June 27, 2016, blog post, he did not limit himself to refuting the allegations of substandard care made against him, but also discussed the propriety and fairness of statutes of limitation and statutes of repose and impugned his former patients' motives in bringing FTCA suits, which had nothing to do with whether he himself had committed malpractice.  He stated in his declaration that he alleged to Slack during his interview that VA Togus's investigation of him was a "fraudulent and futile campaign" motivated by the corruption of his supervisors Dr. Sampson and Dr. Richardson and that these supervisors were later forced to resign from the VA due to this investigation; stated his beliefs, not based on any "personal knowledge," that Dr. "Sampson may have been concerned that [Franchini] might be in a position to take over his position, because of physical injury"; and again discussed the statute of limitations under the FTCA.  He "urged" journalist Slack to include these statements in her USA Today article in order to tell the "real story" of the VA Togus investigation, which he had called a "witch hunt."

We hold that Franchini is a voluntary limited-purpose public figure.

### D. Absence of Plausible Claim of Actual Malice

As a voluntary limited-purpose public figure, Franchini is required to show that the alleged defamatory statements against him were made with "actual malice."  Gertz, 418 U.S. at 327-28,

342.  We agree with the district court that he failed to do so in his SAC.

We review de novo the district court's determination that the proposed SAC's new allegations failed to plead actual malice.  See Lemelson v. Bloomberg L.P., 903 F.3d 19, 23 (1st Cir. 2018); see also Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012).  For a pleading of actual malice to survive a motion to dismiss, the plaintiff must plead "non-conclusory, non-speculative[] facts" "from which malice might reasonably be inferred."  Schatz, 669 F.3d at 55, 58.  "[A]ctual-malice buzzwords," such as that the defendant "had 'knowledge' that its statements were 'false' or had 'serious doubts' about their truth and a 'reckless disregard' for whether they were false . . . . are merely legal conclusions, which must be backed by well-pled facts" to be sufficient.  Id. at 56.  Where a plaintiff "has not 'nudged' his actual-malice claim 'across the line from conceivable to plausible,'" the district court is right to dismiss the complaint.  Id. at 58 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"The standard of actual malice is a daunting one."  Howard v. Antilla, 294 F.3d 244, 252 (1st Cir. 2002) (quoting McFarlane v. Esquire Magazine, 74 F.3d 1296, 1308 (D.C. Cir. 1996)).  Because the test for actual malice is a "wholly subjective" one, Lemelson, 903 F.3d at 24 (quoting Levesque v.

<u>Doocy</u>, 560 F.3d 82, 90 (1st Cir. 2009)), rather than an objective one, "a mere deviation from reasonably prudent conduct will not" satisfy it, <u>id.</u> Nor will even "demonstrating 'an extreme departure from professional standards.'" <u>Howard</u>, 294 F.3d at 252 (quoting <u>Harte-Hanks Commc'ns, Inc.</u> v. <u>Connaughton</u>, 491 U.S. 657, 665 (1989)). Instead, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." <u>St. Amant</u>, 390 U.S. at 731. "[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard," <u>Harte-Hanks</u>, 491 U.S. at 688; <u>see also</u> <u>Curtis Publ'g Co.</u> v. <u>Butts</u>, 388 U.S. 130, 153 (1967), although "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports," <u>Harte-Hanks</u>, 491 U.S. at 688 (quoting <u>St. Amant</u>, 390 U.S. at 732).

Further, while "fail[ure] to make any effort to interview" "a key witness" can support a finding of actual malice, <u>see</u> <u>Harte-Hanks</u>, 491 U.S. at 692, allegations of actual malice are unlikely to succeed when an author interviews the defamation plaintiff and includes their statement in the contested article, <u>see</u> <u>Lemelson</u>, 903 F.3d at 24, or includes "both sides of the story" and "countervailing facts," <u>see</u> <u>Howard</u>, 294 F.3d at 252-253, 256

(noting also that "relatively weak" "evidence of actual malice . . . was diluted further by the undisputed fact that [the author] made efforts to include information in the article tending to discredit those who circulated the rumor").

Franchini's SAC failed to meet this standard. The SAC consists of thirteen new paragraphs pertaining to Franchini's actual malice claim. Paragraphs 30-32 and 34 contain mere conclusory allegations that the defendants were "provided with evidence causing them to entertain serious doubts" and that they "possessed information demonstrating, inter alia, that the proposed story was . . . so inherently improbable that only a reckless person would put them into circulation" and that they had "obvious reasons to doubt the veracity of the informant(s)" and "the accuracy of [their] reports." As the district court correctly held, these "actual malice buzzwords," Schatz, 669 F.3d at 55, 58, without more, are insufficient to allow the complaint to survive the pleading stage.

While paragraphs 53-61 do plead specific facts regarding Slack and Gannett, specifically that Franchini questioned the veracity of Slack's source of information, Dr. Sampson; referred Slack to four other doctors, whom she did not contact; and presented her with information that Franchini claimed "demonstrat[ed] . . . the proposed story['s] . . . inherent[] improbab[ility]" to a level where "only a reckless person would

put [it] into circulation," these facts fail to show that these defendants acted with knowledge of the story's falsity or "reckless disregard for [its] truth."  St. Amant, 390 U.S. at 731.  Slack both sought out Franchini for an interview and included his comments in the article.  She also had no "obvious reasons to doubt the veracity of [her] informant" Dr. Sampson or "the accuracy of his reports," see Harte-Hanks, 491 U.S. at 688 (quoting St. Amant, 390 U.S. at 732), despite Franchini's questioning.  The VA's investigation of Franchini's performance at VA Togus and conclusions that his care was substandard were well documented and contrary to the VA's interest.  Slack's decision not to interview Franchini's other suggested sources also does not establish recklessness.  See id.; Curtis Publ'g Co., 388 U.S. at 153. Further, because the USA Today article demonstrated due diligence in reporting on its face, Franchini's claims that other defendants acted recklessly by relying upon this article in their reporting are unfounded.[25]

## IV.

For the above reasons, we **affirm** the judgment of the district court.

---

[25]  Further, because the Portland Press Herald article was published on October 1, 2017 -- before the USA Today article was published on October 11, 2017 -- it could not have relied on the USA Today article's reporting.